## STANDARD PROCESSING CO. v. LOUDON HOSIERY MILLS.

Eastern Section. September 3, 1927.

Petition for Certiorari denied by Supreme Court, February 10, 1928.

Smith & Carlock, of Knoxville, and Susong & Susong, of Greeneville, for appellant.

Sizer, Chambliss & Sizer, of Chattanooga, and J. E. Biddle, of Greeneville, for appellee.

THOMPSON, J. This suit was for damages for breach of a contract whereby complainant sold to defendant 15,000 pounds of mercerized yarn. The case went to the Supreme Court and was remanded to the chancery court, "with leave to both parties to introduce such testimony as they may desire with reference to the date upon which the contract was breached by defendant, and as to the damages which complainant sustained by reason of said breach." At the hearing upon the remand the Chancellor held that the contract was breached on June 4, 1920; that on that date the market price of the yarn was fifty cents per pound less than the contract price; and that there were 14,542 pounds of yarn which defendant had failed and refused to accept and pay for under the contract. He then rendered judgment against defendant for the sum of $7,271, with interest thereon from June 4, 1920.

Both parties have appealed and assigned errors, the complainant's insistence being that the breach occurred about October 25, 1920,

at which time the market price of the yarn was $1.64 less than the contract price and, therefore, that the recovery should have been in the sum of $23,848.88.

Both complainant and defendant are Tennessee corporations. The defendant's mill is at Loudon where it is engaged in the textile industry. The complainant's plant is at Chattanooga, from which place its shipments are made, but its sales and contracts office is at Philadelphia, Pennsylvania. Complainant purchases raw yarn and mercerizes it into a yarn known as "Combed Peeler Mercerized Cones," of various counts and plys, i. e., 30/2; 50/2; 60/2; 80/2; etc., the first figures representing the count or size and fineness of the yarn, and the second figures representing the ply of the yarn.

The contract in question was evidenced by writing, and was entered into on December 16, 1919. It was for 15,000 pounds, and for delivery during the months of April, May and June, 1920, but defendant had the right, within said time limits, to call for deliveries when it desired, and also had the right to specify the numbers desired, but at the following prices:

| | |
|---|---|
| 30/2 | $2.50 |
| 50/2 | $3.25 |
| 60/2 | $3.65 |
| 80/2 | $5.25 |

Complainant delivered to defendant and defendant paid for 408 pounds of 80/2 yarn, but this was all that was ever accepted and paid for under the contract, and the suit is to recover for the difference between the contract price and the market price (at the time of the breach) calculated upon the remaining 14,543 pounds and upon the cheapest grade of the yarn, i. e., 30/2, the damages being less when calculated upon this count and ply.

Since the time of the breach is one of the questions involved, and since counsel for both parties lay much stress upon the correspondence between the parties subsequent to the execution of the contract, we will in our statement of the facts set it out in this opinion.

On April 7, 1920, complainant wrote defendant as follows:

"Please send us at once specifications for order No. 1660 calling for 15,000 lbs., delivery April, May and June."

On April 22, 1920, complainant wrote defendant as follows:

"Your order No. 1660, calling for 15,000 # delivery April, May and June. Please give us specifications on the different counts you desire on this contract, as we are in good shape to take care of your needs."

On April 24, 1920, defendant wrote complainant as follows:

"Replying to yours of the 22nd in which you request specifications on order No. 1660, beg to advise that Mr. Bacon is away from the mill, and will be away for several days. However, upon his return

the matter will be brought to his attention promptly."

Before quoting any more of the correspondence it is proper to state here that about the last of April or first of May, 1920, the complainant, without having received any specifications and without having been requested to do so, shipped to defendant the 408 pounds of 80/2, hereinbefore mentioned. Defendant kept and paid for this 408 pounds.

On May 3, 1920, defendant wrote complainant as follows:

"Referring to contract Number 1660, beg to ask that you do not ship us any more 80/2 against this contract as we have discontinued using this number.

"In reference to specifications on the above contract, Mr. Bacon will advise regarding this upon his return to the mill within the next few days."

On May 5, 1920, complainant wrote defendant as follows:

"Replying to yours of the 3rd. As requested we will ship you no 80/2 for the present and will await your instructions, which you promise to give within the next few days.

"We would like it understood that we purchased 80/2 and same is being delivered to us against your order and the same applies to your other counts. We will always try to give you yarn as you require, but it is difficult to do so in times like this. We hope we will hear from you without further delay."

On May 19, 1920, complainant wrote defendant as follows:

"Contract No. 1660—This contract calls for delivery April, May and June and you have given us no specifications on same, and only one shipment of 80/2, consisting of 408 lbs., has been made.

"In your letter of May 3rd you advised us to ship no more 80/2 and that specifications would follow in a few days. Unless we have your specifications by return mail we will begin shipping."

On May 31, 1920, defendant wrote complainant as follows:

"Replying to yours of the 19th in reference to specifications on contract No. 1660, beg to advise that Mr. Bacon is away from the mill at the present time. However, the matter will no doubt be taken up with you sometime next week. In the meantime please do not make any shipments on this contract until we furnish specifications."

The foregoing correspondence was with the complainant's Chattanooga office, and the defendant's end of it was carried on by Mr. M. C. James. Mr. James was the treasurer of the defendant company, but he held office merely by appointment by Mr. Bacon, who was the president and general manager and also the largest stockholder, and Mr. James was in reality very little more than an office man and bookkeeper—Mr. Bacon being the man in actual and active authority over the defendant's affairs, contracts and operations.

On June 1, 1920, complainant shipped (of course from its plant at Chattanooga) to defendant 1245 pounds of 60/2.

On June 4, 1920, Mr. Bacon was in Philadelphia and called at the complainant's office. Mr. John M. Jones, a friend of Mr. Bacon's, who operated a hosiery plant at Sweetwater, happened to be in Philadelphia and went with Mr. Bacon to defendant's office. Mr. Bacon testified, and Mr. Jones corroborates him, that he went to Philadelphia and to defendant's office for the purpose of relieving his company of this contract. They had a conference with Mr. Verlinden, president of the complainant company, and Mr. Hood, a salesman of the Philadelphia office. Bacon told them that he could not use the yarn, could not pay for it, did not want it, and was not going to take it. He then offered to settle whatever loss the complainant had sustained. Mr. Hood, then suggested that they settle for $5,000, but Mr. Verlinden immediately spoke up and declined to do so. Verlinden then offered to settle at sixty cents per pound. Bacon then suggested thirty cents per pound—which Verlinden refused. The conference broke up and Bacon returned to Loudon without any agreement having been reached.

Mr. Bacon testified, and it is his contention, that he told Verlinden and Hood positively and unequivocally that he would not accept and pay for the yarn, and that from that time on all the negotiations between the parties was merely as to the amount of damages which he should pay. Mr. Jones does not put it quite so strong, but does testify that Mr. Bacon told them either that he "would" not or "could" not receive and pay for the yarn. But they both testify that no agreement was reached, and it is clear from their testimony that no "cancellation" or "rescission" of the contract was effected. Mr. Verlinden and Mr. Hood both died and, of course, did not testify. The question then is: did this amount to such a breach of the contract by Bacon or rather defendant that the damages should be fixed as of that date, i. e., June 4, 1920? Defendant insists that it was, and complainant insists that it was not. Since complainant insists that the subsequent correspondence between the parties has a material bearing on the question, we will proceed with our quotation of the correspondence and come back to said question later on.

On June 7, 1920, which was the day after Mr. Bacon returned to Loudon from Philadelphia, defendant wrote complainant at Chattanooga as follows:

"We are returning invoice dated June 1st, covering four cases of 60/2 mercerized cones, as we have arranged with your Philadelphia office to withhold shipments for the present."

This letter of course referred to the 1245 pounds of 60/2 which complainant, without having been requested to do so, had shipped to defendant on June 1, 1920, and which defendant had returned. It was written by Mr. James. Mr. Bacon did not see it, and testifies that he merely told Mr. James to return the yarn as he had an understanding with the Philadelphia office.

On June 21, 1920, Mr. Bacon wrote Mr. Hood as follows:

"In further reference to our conversation when the writer was in Philadelphia, in which you suggested that you would be willing to cancel the balance due on our contract at a loss to us of sixty cents per pound, will state that if you can possibly see your way clear to allow us to take a loss between five and six thousand dollars we would prefer to do so, because we have not found so far any improvement in our business and we feel it will be an unreasonable length of time before we will be able to take this yarn in.

"We appreciate very much your desire to assist us in every way possible and your willingness to sell us an additional contract at a very low price, so that we may average up our loss on this contract. This is very well and good, but it appears to us now that we are going to have to close down our mill or run on some carded and combed stuff for a limited time, and for this reason we are appealing to you as we are, and we hope you can arrange some way to meet our views in this matter."

On June 24, 1920, Mr. Hood wrote defendant as follows:

"We have your favor of the 21st. Since seeing Mr. Bacon on his recent trip to Philadelphia, there has been a continued weakness in the price of mercerized yarn. At that time we were willing to take a chance on selling your order on a basis of sixty cents a pound, to be paid by you to us on the undelivered portion of your contract. Since that time, however, prices have declined five or ten cents a pound and there is practically no business stirring. You can readily see, therefore, that most any proposition that we could make along the lines of a cash settlement would leave us stranded high and dry in the case of a further decline in the market.

"Figured on the number most favorable to you, which is 30/2 there is a difference of seventy-five cents lb. between your contract price and the price we are willing to sell for today. If you would care to settle for this amount and allow us in addition five per cent to sell your contract, we think that we could arrange to come together on such a basis. Please let us hear from you if you wish to settle with us as outlined above."

On June 26, 1920, Mr. Bacon wrote Mr. Hood as follows:

"We are in receipt of yours of the 24th, in reference to settlement of the mercerized yarn contract which we have with you, and in this connection will state that we sincerely trust you will be able to see your way clear whereby you can name us a better proposition than sixty cents per pound, which you named the writer when in Philadelphia. We note, however, that silk has advanced to $10 per pound and this being true it should help mercerized yarn very much.

"However the writer expects to be in Philadelphia sometime after the fourth of July, and at this time will be glad to talk over the whole situation with you.

"Thanking you very much for your indulgence, we beg to remain," etc.

On June 28, 1920, Mr. Hood wrote Mr. Bacon as follows:

"We have your favor of the 26th and we will be very glad to see Mr. Bacon when he is in Philadelphia next month."

On August 20, 1920, Mr. Hood wrote Mr. Bacon as follows:

"Referring to your order # 1660 calling for delivery early May and June, as you know we have granted your repeated requests to defer shipments on this contract. We have been pleased to comply with your requests in this matter, as we fully appreciated the conditions prevailing in the hosiery business, and it was our idea to aid our customers in every way as long as it was possible for us to do so.

"To some extent at least, we have been assisted by various spinners with whom we have been doing business, who in turn have held up shipments to us. The time has come when spinners have been insistent upon making full deliveries and it will be necessary, therefore, for us to ship our yarn on our mercerized yarn contracts accordingly.

"We suggest that we definitely arrange to ship your contract and divide the yarn due over the months of September to December, inclusive, making equal monthly shipments commencing in September. This will make the quantity of yarn received in any one month small and will not be embarrassing in any way to you, we feel sure. In consideration of our agreement to defer deliveries, we will thank you to send us at once a list of numbers in which you would prefer to have shipment made.

"Trusting that you will give this matter your immediate attention, we are," etc.

On August 23, 1920, Mr. Bacon wrote Mr. Hood as follows:

"We are in receipt of yours of the 20th and in reply beg to advise the writer expects to be in Philadelphia between the 6th and 10th of September, at which time will be glad indeed to take the matter up with you."

On September 30, 1920, Mr. Hood wrote Mr. Bacon as follows:

"We wrote you on the 20th of August regarding deliveries on your contract to which you replied August 23rd saying that Mr. Bacon expected to be in Philadelphia between the 6th and 10th of September, at which time he would talk the matter over with us. We did not hear from Mr. Bacon at the time stated, nor have we heard from you by letter since August 23rd.

"We wish to state positively that it is very necessary that we make definite arrangements regarding deliveries on your contract. We have carried this burden ourselves for a long time, and we know that you realize we have been more than lenient with you. Spinning mills have almost without exception, insisted on making deliveries to us, some of them indeed insisting upon making the entire delivery

called for in our contracts. We have taken this yarn in and held it in our mill. It is not only fair that we make deliveries on our mercerized yarn contract, but it is vitally necessary that we do so.

"Before taking any further action, however, we would like to arrange with you a system of deliveries extending over several months that will be acceptable to you, and give you the numbers which you believe you can most readily use. The main point is that we must have a definite arrangement so that we can arrange our own affairs accordingly. We suggest that you make out a list of numbers that you are practically sure of using, and we also suggest that you make us a definite proposition as to the amount of yarn you would like to take in monthly from now on. We think we can meet you on any reasonable proposition you make, if it is definite."

On October 5, 1920, Mr. Bacon wrote Mr. Hood as follows:

"We are in receipt of yours of the 30th. and in reply beg to advise we would appreciate it very much if you would arrange to call and see us on your first trip south, at which time we will be glad indeed to take up the entire matter in question. Trusting you can arrange to do this at your earliest convenience, we beg to remain," etc.

On October 7, 1920, Mr. Hood wrote Mr. Bacon as follows:

"In reply to your favor of the fifth, the writer has no idea as to the next time it will be possible for him to go south, and we certainly would not want to let the matter of your contract drag as indefinitely as a trip south would necessitate. We do not see that there is very much to talk about in this matter, except coming to some agreement as to the extension of delivery on the contract. As we informed you, we are perfectly willing to make any reasonable arrangement regarding the delivery on this order, and we suggest that you figure out some proposition and submit to us. As a suggestion we might say that we would be willing to make a definite arrangement with you to ship the order in at the rate of say, 2000 lbs. a month commencing this month. Such a small monthly delivery would be a very light burden to bear, even though you had no immediate use for the yarn. The point that we are trying to make, however, is this, that the time has come when it is absolutely necessary that we are aided in the heavy burden which we have carried alone for the last four or five months.

"We think that the above suggestion an eminently liberal one and we feel sure that you will be glad in this way to co-operate with us. Please let us hear from you at your earliest convenience."

On October 15, 1920, Mr. James wrote Mr. Hood as follows:

"Replying to yours of the seventh, beg to advise that Mr. Bacon is out of town at the present time, but upon his return to the mill the matter referred to will be brought to his attention."

On October 15, 1920, Mr. Hood wrote Mr. Bacon as follows:

"For some time we have been awaiting specifications on your yarn contract with us. As you know, delivery has been held up at your request until this time. We cannot know just what specifications you desire until the information is given us.

"At this time we desire and request that you specify to us your wishes in regard to the count of yarn we shall furnish you with. The yarn can be delivered in a very short time and we are ready and willing to deliver. We cannot further extend the time of delivery.

"As the giving of specifications requries but a short time, we fix ten (10) days for your reply, and in the absence of a reply within that time, or thereabouts, we shall assume that you refuse delivery of the yarn."

On October 27, 1920, Mr. Bacon wrote Mr. Hood as follows:

"Replying to your letter of the fifteenth. Since my conference with you in June, in which I advised you that I would be unable to furnish specifications on yarn contract, and that I could not use the yarn and at which conference it was understood that the contract would be cancelled and that an adjustment would be made at some amount less than what you claimed your damages would be at that time on account of the cancellation, I have counted upon the result of that conference, and have depended upon being able for us to reach a settlement in keeping with the agreement of that date.

"I shall therefore be glad to take the matter up with you along that line."

On November 3, 1920, Mr. Hood or perhaps Mr. Verlinden wrote Mr. Bacon as follows:

"We have your letter of October 27th. You are in error in intimating that your contract with us was cancelled at our conference in June and that an adjustment would be made at some amount less than our damages, according to the market price at that time, and your own statement shows that no such settlement was reached.

"You might have refused to accept further deliveries and pay us our damages, but you were not willing to do this, so that the matter was left where it had been, although you assured us that we would not lose anything on this contract.

"If you had then cancelled the contract and paid us what was due, we would have been able to sell the yarn at the then market price, but until that was done, we were bound to hold ourselves in a position to perform our part.

"In view of our letter to you of October 15th and your reply of the twenty-seventh ult., we must now assume that you do not intend to perform and we shall, therefore, hold you to liability for loss computed as of October 27, 1920."

On February 18, 1921, complainant wrote defendant as follows:

"Since we wrote you on October 15, 1920, we have heard nothing

from you and as the time for specifications was fixed in that letter we can only assume that you now expect to make an adjustment of the claim arising out of your refusal.

"Our losses have been heavy and yet we have postponed somewhat our demand on you, realizing the unsettled state of the trade. However, we now feel that it is only right a prompt adjustment should be made and accordingly ask that you let us hear from you in regard to the matter."

On February 24, 1921, Mr. Bacon wrote complainant as follows:

"Replying to yours of the eighteenth we indicated in our letter to you of October 27, 1920, basis upon which we are willing to adjust this claim. Statement of the sale of the yarn which we cancelled June 4, 1920 will enable us to check it up and therefrom determine what amount, if anything should be used as a basis for settlement."

This was the last letter which passed between the parties themselves, and the bill in this cause was filed on July 26, 1921.

As hereinbefore stated, there was no "cancellation" or "rescission" of the contract at the conference in Philadelphia on June 4, 1920, because Mr. Verlinden and Mr. Hood would not agree thereto, and neither party could cancel or rescind the contract without the consent of the other. Ault v. Dustin, 100 Tenn., 366, 45 S. W., 981; Gentry Co. v. Margolius, 110 Tenn., 669, 75 S. W., 959; Inman v. Cotton Mills, 116 Tenn., 141, 92 S. W., 760; So. Pub. Co. v. Clements Paper Co., 139 Tenn., 429, 201 S. W., 745; John Deere Plow Co. v. Shellabarger, 140 Tenn., 123, 203 S. W., 756.

Neither do we think that Mr. Bacon's statement to Mr. Verlinden and Mr. Hood that he could not and would not accept and pay for the yarn, constituted such a "breach" of the contract as now entitles defendant to have its damages assessed as of June 4, 1920. The contract still had nearly a month to run; that is, there was still nearly a month in which specifications and deliveries could be made, and complainant having reached no agreement with defendant, and not having treated the contract as ended except for the purpose of suit, etc., defendant could later (within the month of June) have specified the counts it desired and could have required complainant to deliver them. There was ample time between June 4th and June 30th for defendant to have specified the yarn it desired and for complainant to have then mercerized and delivered it, even though complainant had not already mercerized the yarn, and did not already have it in stock ready for delivery. But we think the record shows that at all times during the months of April, May and June, 1920, complainant had enough mercerized yarn on hand of the counts and plys enumerated in the contract to have made immediate deliveries to defendant upon receipt of specifications and without having to

mercerize any yarn after receiving the specifications. For instance on March 31, 1920, complainant had on hand, as shown by its inventory, the following:

| | | |
|---|---|---|
| 30/2 | 18,574 | pounds |
| 50/2 | 90,321 | ,, |
| 60/2 | 132,218 | ,, |
| 80/2 | 26,516 | ,, |

And on June 30, 1920, complainant had on hand the following:

| | | |
|---|---|---|
| 30/2 | 26,996 | pounds |
| 50/2 | 108,268 | ,, |
| 60/2 | 204,999 | ,, |
| 80/2 | 41,263 | ,, |

In so far as 30/2 are concerned complainant shipped altogether between March 31 and June 30, 1920, only 6,751. And we think it clear from the record that if it had been necessary, complainant could have made immediate shipments of the entire 14,542 pounds covered by the contract from its stock on hand had defendant specified the desired counts and plys subsequent to June 4, 1920, and prior to June 30, 1920. And indeed we think the record fairly discloses that if defendant had specified the counts it desired during a period of some days subsequent to June 4, 1920, complainant could have mercerized and delivered the said yarn by June 30, 1920. So we do not think that Mr. Bacon's statement made on June 4, 1920, that he could not and would not receive and pay for the yarn, no matter how unequivocal it may have been, amounted to such a breach of the contract as entitled him to have his damages assessed as of that date, as complainant did not treat it as a breach or as putting an end to the contract except for the purpose of suit, etc. Wildberg v. Darby, 143 Tenn., 73, 223 S. W., 855, Tenn. F'ert. Co. v. Int. Agr. Co., 146 Tenn., 451, 243 S. W., 81; Vosburg v. Mfg. Co., 147 Tenn., 647, 251 S. W., 41; Lamborn v. Green, 150 Tenn., 38, 262 S. W., 467.

But we think that when defendant let June 30, 1920, pass without having specified any yarn, etc., it thereby breached the contract as of that date. And we do not agree with the insistence of counsel for complainant that there was any postponing or holding up of deliveries or any agreement in regard thereto which kept the contract alive until October 15, 1920, upon which date complainant wrote the letter in substance notifying defendant that if specifications were not made within ten days the contract would be treated as breached, etc.

As we understand the contract, the fact that no deliveries were made during the months of April and May did not extend the delivery time through July and August, etc. Defendant had the right to say when the deliveries should be made during the three months period, i. e., April, May and June, and defendant had the right to

say that no deliveries should be made until the last of June. So defendant's letter of June 7th (written by Mr. James) saying that "we have arranged with your Philadelphia office to withhold shipments for the present," would not have shown, even if Mr. Bacon himself had written it, that there had been any agreement made extending the delivery period. And of course the testimony of Mr. Bacon and Mr. James entirely negatives the idea that there had been any agreement with regard to, or extension of, the delivery period. In fact, Mr. Bacon's letter of June 21, 1920, to Mr. Hood, says in substance that he (Bacon) would rather pay money in settlement than to have the delivery time extended because an extension of time would do him no good.

It is true that in complainant's letter of August 20, 1920, the statement is made that complainant had granted defendant's repeated requests "to defer shipments on this contract," and in complainant's letter of October 15, 1920, the statement is made that "delivery has been held up at your request until this time," but there is nothing in any of the letters written by defendant that justified these statements, and no witness testified that defendant had requested any extension of the delivery time or that any had been agreed upon. And of course any request by defendant during April, May and the early part of June to temporarily hold up shipments would not operate to extend the delivery time, because defendant had the right under the contract to say that no deliveries should be made until the latter part of June.

Clearly there is nothing in the correspondence prior to June 30, 1920, which indicates that the delivery time had been extended, and the correspondence subsequent to June 30th should be read with reference to the facts as they existed, i. e., defendant had breached its contract and was liable to complainant for damages, defendant was a good customer of complainant and complainant preferred to extend the delivery time rather than to enforce defendant's liability to it. Bearing these facts in mind, it seems to us that the proper construction to put upon the correspondence subsequent to June 30th is that complainant offered to extend the delivery time rather than enforce liability, but that defendant never accepted this offer. For instance, in complainant's letter of August 20, 1920, which was of course after the contract had been breached, it is stated:

"We suggest that we definitely arrange to ship your contract and divide the yarn due over the months of September to December inclusive, making equal monthly shipments commencing in September. This will make the quantity of yarn received in any one month small and will not be embarrassing in any way to you, we feel sure. In consideration of our agreement to defer deliveries, we will thank you to send us at once a list of numbers in which you would prefer to have shipment made."

It seems to us that this was a plain offer to defer shipments until September to December, inclusive, rather than to enforce liability, and while Mr. Bacon replied that he expected to be in Philadelphia between the 6th and 10th of September and would take the matter up with complainant, yet he never accepted the offer. Again in complainant's letter of September 30, 1920, it said:

"Before taking any further action, however, we would like to arrange with you a system of deliveries extending over several months that will be acceptable to you, and give you the numbers which you believe you can most readily use." Here again was an offer which Mr. Bacon did not accept, although he replied stating that he would be glad to take up the entire matter with Mr. Hood on Mr. Hood's next trip south. And the same in substance might be said as to complainant's letter of October 7, 1920, wherein it was said: "We do not see that there is very much to talk about in the matter except coming to some agreement as to the extension of delivery on the contract. As we informed you, we are perfectly willing to make any reasonable arrangement regarding the delivery on this order," etc. It is also worthy of notice that in complainant's letter of November 3, 1920, in speaking of the conference of June 4, 1920, it was said: "You might have refused further deliveries and pay us our damages, but you were not willing to do this, so that the matter was left where it had been," etc. This negatives the idea that any extension of the delivery time was agreed upon.

In our opinion the most that is shown by the correspondence is that complainant, rather than enforce defendant's liability to it for having breached the contract, offered to extend the time for deliveries, but defendant did not accept these offers, and complainant could not without defendant's agreement extend the delivery time so as to force defendant to pay it heavier damages if the market continued to go down, as was the case. So we find that defendant breached the contract on June 30, 1920, and that the damages should be assessed as of that date.

Defendant insists that the difference between the contract price and the market price at the date of the breach was not the proper measure of the damages because the contract was executory and the yarn was not in esse, and cites the following cases in support thereof: Ault v. Dustin, 100 Tenn., 365, 45 S. W., 98; Gardner v. Deeds & Hirsig, 116 Tenn., 128, 92 S. W., 518; John Deere Plow Co. v. Shellabarger, 140 Tenn., 123, 203 S. W., 756; Tenn. Fert. Co. v. Int. Agr. Corp., 146 Tenn., 451, 243 S. W., 81; Hardwick v. Can Company, 113 Tenn., 657, 88 S. W., 797; Smith v. O'Donnell, 76 Tenn., 468.

For the reasons hereinbefore stated we think the yarn was in esse, that the rule laid down in the foregoing cases is not applicable to

the facts of this case, and that the proper measure of damages in this case was the difference between the contract price and the market price at the time of the breach.

The Chancellor so held, but he found the breach to have occurred on June 4, 1920, and that the then difference was fifty cents per pound on 30/2—the most favorable count to defendant. We think the difference of fifty cents per pound on June 4th, as found by the Chancellor, was too high. The testimony of the complainant's auditor, Mr. Gamble, that the difference at Chattanooga on June 4, 1920, was fifty cents per pound was based on one or two small sales which complainant had made there. The defendant's evidence, being that of men in the north and east and based upon sales there, was to the effect that the difference was not nearly so great as fifty cents per pound. While this evidence of defendant is not at all controlling yet it carries some weight. A circumstance which tends strongly to our belief that a difference of fifty cents per pound on June 4, 1920, was more than actually existed is that on April 15, 1921, (which was before the suit was instituted but after the claim had been put in their hands) the attorneys for complainant wrote the attorney for the defendant outlining and defining the claim and their demands, etc. In this letter they said:

"In order that you may be informed as to all the aspects of the claim we further say that 80/2 ply on June 3, 1920, had a market value of $4.50, making a loss on that count of seventy-five cents and a resulting damage of $10,944. We have also estimated the loss on 30/2 ply. On June 3rd, 30/2 ply were selling for $2.35, making a loss of fifteen cents a pound or $2188.80; on October 20th the price of 30/2 ply was eighty-five cents making a loss on them at that time of $24,026.80."

Complainant made no effort whatever to explain this statement of its counsel that on June 3, 1920, the difference in 30/2 was only fifteen cents per pound.

It is undisputed that the market gradually went down after June 4, 1920, and after examining the evidence we are of the opinion that fifty cents per pound was about what the difference was on June 30, 1920—the date of the breach—and that the amount allowed by the Chancellor, i. e., $7,271, was therefore in reality about right. But we do not think he should have allowed interest prior to the filing of the bill.

A decree will therefore be entered in favor of the complainant and against the defendant and the sureties on its appeal bond for the sum of $7,271, and interest thereon from July 26, 1921.

The costs of the lower court will remain as there adjudged and the costs of the appeals will be adjudged one-half against each party.

Portrum and Snodgrass, JJ., concur.